**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Trad Thornton, *administrator of the* *estate of* Sally Urquhart, et al., | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| M7 Aerospace LP, et al., | ) ) |
| Defendants. | ) |

Case No. 12 C 329

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

This action arises out of a commuter airplane crash on May 7, 2005 near Lockhart River

in Queensland, Australia.  On May 4, 2007, the personal representatives of the deceased

passengers filed a negligence and strict products liability action against Defendant M7

Aerospace LP and others.  Defendant is the corporate successor to the original aircraft

manufacturer. Before the Court is Defendant's motion for summary judgment on Counts VII,

VIII, IX, X, XI, and XII of the Second Amended Complaint.  (R. 74.)  For the following reasons,

the motion is granted.

**BACKGROUND**

**I.      Factual Background**

**A.      Accident**

On May 7, 2005, Transair was operating a commuter aircraft with service from Bamaga,

Australia to Cairns, Australia, with an intermittent stop in Lockhart River, Australia.  (R. 76 &

96, Undisputed Facts[1] ¶ 6; R. 76-1, Am. Compl. ¶ 3.)  The aircraft was a Fairchild Aircraft

SA227-DC Metro 23, with tail number VH-TFU (the "Subject Aircraft").  (*See* R. 76 & 96,

Undisputed Facts ¶ 6.)  On approach to Lockhart River Airport, the Subject Aircraft crashed,

resulting in the deaths of the passengers and crew.  The incident was one of the worst civil

aviation accidents in Australian history.[2]

**B.     Fairchild Aircraft, Inc.**

"The Subject Aircraft was designed, manufactured, assembled, tested, and sold by

Fairchild Aircraft, Inc." or "Fairchild."  (R. 76 & 96, Undisputed Facts ¶ 7.)  Fairchild, now

defunct, "operated as an aircraft and aerospace manufacturing company until it filed for

bankruptcy in 2002."  (*Id.* ¶ 8.)  Fairchild was a wholly-owned subsidiary of Fairchild Dornier, a

German corporation that also sought bankruptcy protection in 2002, halting its American

operations.  (*Id.* ¶¶ 26-27.)

In 1990, the Federal Aviation Administration ("FAA") issued Fairchild a certificate to

manufacture the type of aircraft involved in here – the SA227-DC – "based on Fairchild's design

and testing specifications."  (*Id.* ¶¶ 7, 9.)  "Fairchild manufactured the Subject Aircraft in 1992

to the specifications approved by the FAA and requested by the purchasing customer," a non-

---

[1]Citations to "Undisputed Facts" refer collectively to Defendant's Local Rule 56.1 Statement of Facts (R. 76) and Plaintiffs' response thereto (R. 96).  Similarly, citations to "Add'l Undisputed Facts" refer collectively to Plaintiffs' Local Rule 56.1 Statement of Additional Facts (R. 96) and Defendant's response thereto (R. 108).  For purposes of clarity, the Court will use these citation references where the fact preceding the citation is undisputed.

[2]*See* "Ten Worst Civil Aircraft Accidents in Australia – since 1968," Australian Transport Safety Bureau, *available at* http://www.atsb.gov.au/media/30125/worst_crashessince68.pdf (last visited Oct. 15, 2012); "No Survivors in Plane Crash," *Sydney Morning Herald*, May 8, 2005.

party Mexican airline, Aerovias de Mexico.  (*Id.* ¶ 10.)  Fairchild sold the Subject Aircraft in

1992 and the Mexican company took delivery in January of 1993.  (*Id.* ¶ 11.)  In 2000, Fairchild

"ceased manufacturing aircraft" at its facility in San Antonio, Texas.  (*Id.* ¶ 12.)  In July of that

year, Fairchild "sold its last SA227-DC model aircraft."  (*Id.*)  "There are approximately 700 of

this type of aircraft still flying today."  (R. 96 & 108, Add'l Undisputed Facts ¶ 10.)

###    C.    Bankruptcy and Asset Purchase

On July 25, 2002, "Fairchild filed a bankruptcy petition" in the Western District of

Texas.  (R. 76 & 96, Undisputed Facts ¶ 13.)  At the time of its bankruptcy, Fairchild

"concentrated its business on manufacturing and supporting Fairchild Dornier aircraft."  (*Id.* ¶

26.)

4M Investments LLC ("4M"), a private investment company, acquired Fairchild's assets

at an auction during the bankruptcy proceedings.  (*Id.* ¶ 13.)  "4M was formed in 2001 by Ted B.

Miller, Jr., who is its sole owner and manager."  (*Id.* ¶ 14.)  During the bankruptcy proceedings,

"five qualified bidders," including 4M, made offers to purchase Fairchild's assets.  (*Id.* ¶ 15.)

4M won the action with the "highest and best" offer.  (*Id.*)  On December 12, 2002, following

the action, Fairchild and 4M executed an Asset Purchase Agreement," which included these

terms:

> <u>Definitions</u>.  "Liabilities" shall mean any direct or indirect liability, indebtedness,
> obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by
> any person or any type, whether accrued, absolute, contingent, matured, unmatured or
> other.
>
> § 2.3.  <u>Assumption of Liabilities</u>.  The only liabilities and obligations to be assumed
> herein by the Buyer in connection with the transfer of Assets from Sellers shall be: (a)
> Those liabilities and obligations to be performed after Closing pursuant to the Assumed
> Contracts, but only to the extent that such obligations arise as a result of operations after
> Closing or relate to products  to be sold and delivered after Closing; (b) All obligations of

Sellers under the Permits and Certificates, but only to the extent that such obligations arise as a result of operations after Closing; (c) The purchase price, including freight, insurance and the like, for goods in transit at the Closing or for goods delivered prior to the Closing and still on hand, but invoices have yet to be received . . . ; [and] (d) Standard warranties for the Subsidiaries' customers identified in the Subsidiaries sales journal for the twelve (12) months immediately prior to the Closing Date . . . .

§ 2.4. <u>Excluded Liability</u>.  Except as expressly identified [in § 2.3,] Buyer does not and will not assume or become obligated to pay, perform or discharge and will not be responsible for, any other liabilities or obligations of Sellers, whether accrued, absolute, contingent or otherwise, including, without limitation, liabilities or obligations based on, arising out of or in connection with any pre-Closing event or transaction, including, but not limited to . . . (c) Liabilities of Sellers to third parties for (i) personal injury or property damage occurring prior to the Closing Date (ii) liability for personal injury or property damage arising at any time out of or in connection with goods manufactured, produced, distributed or sold by the Sellers prior to the Closing Date, including but not limited to any Product Liability claims . . . .

(*Id.* ¶¶ 15, 19-20.)

In a written order dated December 18, 2002, the Bankruptcy Court approved the Asset Purchase Agreement.  The court stated "that the assets sold to 4M 'shall be free and clear of any liens, claims and encumbrances'" and that "4M was 'not an insider or affiliate' of Fairchild." (*Id.* ¶¶ 16-17.)  Then, in 2003, 4M assigned the Asset Purchase Agreement to Defendant M7, which in turn "assumed" the Asset Purchase Agreement.  (*Id.* ¶ 18.)

## D.  Successor Corporation – Defendant M7

### 1.  Ownership and Assets

M7 is a "privately-held small business" that Mr. Miller (owner of 4M) and Mr. George Reese "formed in December 2002."  (*Id.* ¶¶ 12, 21-22.)  Neither Mr. Miller nor Mr. Reese "had any prior relationship with or ownership interest in Fairchild" or any of its corporate affiliates. (*Id.* ¶¶ 22, 23, 29.)  M7 operates from a San Antonio facility that it purchased from Fairchild, and employs certain former employees of Fairchild, including mechanics who worked on the

subject model aircraft.  (R. 96 & 108, Add'l Undisputed Facts ¶¶ 4-5.)

"M7 did not assume any of Fairchild's service contracts relating to the Subject Aircraft, and M7 never serviced, maintained, or repaired the Subject Aircraft."  (R. 76 & 96, Undisputed Facts ¶ 31.)  M7 never had "any service contracts covering the Subject Aircraft with any owner or operator of the Subject Aircraft, including Transair."  (*Id.* ¶ 32.)

M7 owns "the rights to Fairchild's technical publications" and the "right to use the Fairchild name" as part of the assets it acquired in the bankruptcy sale."  (R. 96 & 108, Add'l Undisputed Facts ¶ 12.)  M7 also holds the "type certificate [for] the SA227-DC model" and is "the Original Equipment Manufacturer for the fleet of Fairchild-built Metro aircraft (among others)."  (R. 76 & 96, Undisputed Facts ¶ 30.)  "A type certificate is a document provided by the FAA which demonstrates [that] an aircraft model has met the requirements for FAA certification."  (R. 96 & 108, Add'l Undisputed Facts ¶¶ 7-10.)  As the holder of the type certificate, M7 had the right "to manufacture parts" and to hold "exclusive ownership of the technical data, including all drawings, reports and analyses used to either build, substantiate, or validate the aircraft design"  (*Id.* ¶ 8.)  Defendant M7 obtained the type certificate to allow it to sell parts and support the fleet of existing aircraft manufactured under that certificate.  (*Id.* ¶ 10.)

### 2.    Operations and Business Activities

"M7 began operations in April 2003 with three primary business units focused on 'Merlin' [Model SA226] and 'Metro' [Model SA227] aircraft."  (R. 76 & 96, Undisputed Facts ¶ 24.)  These units were:  "(1) a part and product support division; (2) a government contracts division; and (3) a maintenance, repair and overhaul operation."  (*Id.* ¶¶ 24-25 (logical support to the government is the primary revenue-generating business).)  At the San Antonio facility, M7

"manufactures parts for Merlin and Metro aircraft . . . and builds and assembles aircraft parts for" other aerospace companies, including Boeing, Northrop Grumman, Lockheed Martin, and Sikorsky. (*Id.* ¶ 25; *see also* R. 96 & 108, Add'l Undisputed Facts ¶ 11 (proprietary parts).) M7 has "never manufactured any aircraft." (R. 76 & 96, Undisputed Facts ¶ 30.)

M7 promotes itself as the "sole source" of "Fairchild proprietary parts," which are any parts that carry a unique part number and which Fairchild has the exclusive right to manufacture and license. (R. 102, Provost Dep. at 84.) M7 "enthusiastically" took on "the OEM responsibility for Metro/Merlin aircraft support." (R. 106, Hernandez Dep. at 113.) Indeed, at a conference in 2003, M7 advised owners and operators that it acquired rights to all Metro drawings and publications," and assured them that any part from M7 would be "constructed or inspected or put through the M7 quality system based on original manufacturer's data." (R. 103, Provost Dep. at 192-93; *see also* R. 96 & 108, Add'l Undisputed Facts ¶ 7.) The next year M7 advised owners and operators that there would "not be any change to the support they were getting prior to M7 taking over" and that M7 would "provide the same technical advice, same spare parts and availability." (R. 106, Hernandez Dep. at 115; *see also* R. 96 & 108, Add'l Undisputed Facts ¶¶ 7-8.) M7 receives reports from the FAA and operators about defects and safety issues concerning the Fairchild aircraft. (R. 96 & 108, Add'l Undisputed Facts ¶¶ 26-27.)

Defendant M7 publishes and sells flight manuals, technical manuals (including maintenance and inspection manuals) and other records to operators of subject model aircraft. (*Id.* ¶¶ 12-13.) Fairchild created the original flight manual but Defendant M7 "has made and continues to make revisions to this manual." (*Id.*) Defendant additionally publishes a parts catalogue. (*Id.*) From approximately 2003 until 2005, M7 used the Fairchild name on its

manuals, but has since transitioned documents into its own name and logo. (*Id*. ¶ 17 (some may remain today).)

Defendant M7 has a "Technical Support Group" that provides advice, opinions, and information to owners and operators of the subject model aircraft." (*Id.* ¶ 14.) "The basis of this group's ability to provide these services comes from its possession of the type certificate of the subject model aircraft, as well as employees' prior experience with Metro aircraft. (*Id.*) Defendant provides technical support to owners and operations and to government agencies. (*Id.* ¶¶ 7-8, 14-16.) M7 expects its avionics employees to keep abreast of industry developments and to advise owners and operators of safety issues that arise. (R. 100, Kirk Dep. at 84.) M7 learns of safety and technical issues from reporting by owners and operators, as well as attending an annual Metro Operators Conference. (R. 102, Provost Dep. at 97-98.)

M7 – "from time to time" – issues service bulletins to operators of the subject model aircraft. (R. 100, Kirk Dep. at 60.) "A service bulletin is a conveyance from [the original equipment manufacturer] to its customers that certain actions are required." (R. 101, Provost Dep. at 46; *see also* R. 96 & 108, Add'l Undisputed Facts ¶ 24.) One of the reasons that M7 issues service bulletins is to alert owners/operators of safety concerns and advise of possible solutions, which may be the installation of a new product. (R. 96 & 108, Add'l Undisputed Facts ¶ 22.) M7 sends the service bulletin to "everybody who subscribes to technical publications" and also posts a copy on the Internet. (*Id.* ¶ 24.) With regard to the service bulletins that Fairchild previously issued, M7 maintains and publishes them, sometimes with revisions. (R. 102, Provost Dep. at 115-16.)

M7 "makes almost daily changes to its type data for the subject model aircraft," which is "expected with older aircraft because obsolescence requires changes to various components." (R. 96 & 108, Add'l Undisputed Facts ¶ 29.)  M7 "has made amendments to its type data to make parts safer."  (*Id.*)

### 3.    Internal Records

A representative of M7, Mr. Provost, testified that "M7 keeps a list of operators that they're aware of."  (R. 97, Provost Dep. at 164); *see also* Add'l Undisputed Facts ¶ 20).)  Operators "don't have to get M7's permission to sell an airplane."  (R. 103, Provost Dep. at 164.)  In Mr. Provost's experience, "[u]sually the only time that an operator will let us know when they purchased an airplane is because they want to ensure they have a current set of manuals and they're buying the revision service for the manuals."  (*Id.*)  This "list" that M7 "maintains" contains names of "operators who have current revision services with us, who are currently purchasing manuals."  (*Id.* at 164-65.)  M7 updates the list "as people subscribe to the service."  (*Id.*)  In addition to the "revision list," M7 also has "informal lists of operators" that it generates from parts orders.  (*Id.* at 165-66.)

At Mr. Provost's deposition, counsel for Plaintiffs' confronted him with an undated document that "appears to be the revision service customer list for those people receiving paper copies."  (*Id.* at 169.)  Transair was listed as the sixth company in the document, and for that reason, Mr. Provost "expect[s] that Transair is a [customer] of M7."  (*Id.* at 170 (quoting counsel's question); *see also id.*, Ex. D at 81 (testifying that an invoice for technical publications states "ship to Transair").)

#### 4.     Enhanced Ground Proximity Warning System

One of Plaintiffs' central claims in this litigation is that M7 "was negligent in failing to advise the owner and operator of the [Subject Aircraft] to fit that aircraft with an Enhanced Ground Proximity Warning System" or "EGPWS"  (R. 96 & 108, Add'l Undisputed Facts ¶ 34.) This system "was an improvement on the conventional ground proximity warning system" because, among other reasons, it "was capable of providing increased warning time to pilots about potential terrain conflicts by incorporating additional functions into the conventional ground proximity warning system."  (Australian Investigation Report at 38 & 218 (concluding that the advanced system would likely have prevented the crash).)  Significantly, the Subject Aircraft has a ground proximity warning system installed at the time of the incident, but not the enhanced system.  (R. 76-1, Am. Compl. ¶ 4.)

On June 29, 1999, prior to the formation of M7, Fairchild issued a service bulletin with regard to the GPWS.  (R. 100, Kirk Dep. at 61.)  By 2002, owners and operators were communicating with Fairchild – and then M7 – about the EGPWS.  (R. 96 & 108, Add'l Undisputed Facts ¶ 35.)  This was around the same time that the FAA was considering whether to require the enhanced system.  (R. 103, Provost Dep. at 197-203.)  The EGPWS continued to be an "issue for Metro operators" into 2004.  (*Id.* at 204.)

In late 2004 or early 2005, M7 considered offering an enhanced system to owners and operators of the subject model aircraft, but decided against doing so for a variety of reasons.  (R. 96 & 108, Add'l Undisputed Facts ¶ 36.)  M7 additionally considered issuing a service bulletin around that time – instructing operators how to install a unit made by another company – but did not do so because no interested operators approached M7.

At some point, M7 "publishe[d] to owners and operators of the subject model aircraft a list of avionics modifications" that the M7 repair station was "able to install in the aircraft." (R. 96 & 108, Add'l Undisputed Facts ¶ 38; *see also* R. 103 Provost Dep. at 186-87).) Prior to the accident at issue, this list included the enhanced warning system – or EGPWS – as an available modification. (R. 96 & 108, Add'l Undisputed Facts ¶ 38.)

## II.    Procedural History

On May 4, 2007, Plaintiffs commenced this negligence and strict products liability action against numerous defendants including Defendant M7. In the Second Amended Complaint, Plaintiffs assert claims against Defendant M7 in Counts VII, VIII, IX, X, XI, and XII.

Plaintiffs' claims against Defendant fall into two categories: direct claims and indirect claims. *First*, Plaintiffs' indirect claims seek to impose vicarious liability on Defendant as successor-in-interest o Fairchild. Plaintiffs allege that Defendant "is indirectly liable in strict product liability and negligence for the actions of its predecessor, Fairchild[,] in its defective and negligent design of the [Subject Aircraft], its failure to warn of the defects and its failure to advise operators to fit the aircraft with an Enhanced Ground Proximity Warning System." (R. 98, Pls.' Resp. at 1.) *Second*, Plaintiffs' direct claims seek to impose liability on Defendant for its independent conduct. Plaintiffs allege that Defendant "is directly liable [for its] negligent breach of its own duty to so warn and advise." (*Id.*)

### LEGAL STANDARD

Rule 56 provides that a "party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Under the Rule, summary judgment is appropriate "if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *see also Parent v. Home Depot U.S.A., Inc.,*, — F.3d —, 2012 WL 4329332 (7th Cir. Sept. 24, 2012). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

In deciding summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The party seeking summary judgment has the initial burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (citation omitted). "[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility determinations, both of which are the province of the jury." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011) (internal citations omitted).

## ANALYSIS

In the present motion, Defendant seeks summary judgment on Counts VII, VIII, IX, X, XI, and XII of the Second Amended Complaint. Before turning to the merits of these claims, the Court first addresses Plaintiffs' threshold argument that Defendant has not met its initial burden

on its motion for summary judgment.  (R. 98, Pls.' Resp. at 3.)  Plaintiff reasons that Defendant's motion relies "solely" on a declaration from Mr. James Kirk that, according to Plaintiffs, is "inadmissible" for want of personal knowledge.  (*Id.*)  Although Plaintiffs do not support their argument with any relevant case law or citation to any applicable rule, *cf.* Fed. R. Civ. P. 56(c)(4) (affidavits and declarations), their argument is unpersuasive on the merits.  Mr. Kirk worked for Fairchild for three decades before joining M7, where he serves as director of contracting.  Mr. Kirk attested that he has reviewed and has personal knowledge of all underlying documents and events discussed in his declaration.  (R. 76-3, Kirk Decl. ¶¶ 6-19.) This is consistent with and further supported by his deposition testimony.  (R. 99 & 100, Kirk Dep. at 23-38, 97-99.)  Moreover, apart from issues of personal knowledge, most of the underlying documents speak for themselves.  (*See, e.g.*, R. 77, 78, 79, 80.)  To the extent Plaintiffs challenge the veracity of Mr. Kirk's statements and testimony, that is an issue of weight – not admissibility – under these circumstances.  *See Bilek v. Bank of Am., N.A.*, No. 07 C 4147, 2011 WL 830948, at *2 n.1 (N.D. Ill. Mar 3, 2011) (stating that the declarant "not only had personal knowledge concerning her averments, but she also had access to [relevant corporate records]") (citing, inter alia, *Jenkins v. Heintz*, 124 F.3d 824, 831 (7th Cir. 1997)); *Alloc, Inc. v. Pergo, LLC*, No. 00 C 999, 2010 WL 3808977, at *8 (E.D. Wis. Sept. 23, 2010) ("[The declarant's] position and experience, coupled with his review of [internal] documents, render him capable of having 'personal knowledge' not only of current [] policies, but historic [] policies and events documented by [the defendant] in records kept in the ordinary course of business."); *Reyna Cap. Corp. v. LML Techs., Inc.*, No. 03 C 6396, 2007 WL 1029099, at *3 (N.D. Ill. Mar. 30, 2007) (observing that "many of the statements made in the declaration are

based upon Simmons' own personal knowledge as founder of LML and/or acquired by his review of the relevant documents pertaining to the transactions between LML and the lessees contained in LML's files").

## I.      Successor Liability/Indirect Claims – Counts VII, VIII, X and XI

### A.      Choice of Law

The first question is the applicable choice of law.  Defendant moves for summary judgment under the Illinois common law of successor liability.  In response to the motion, Plaintiff relies on Illinois law (R. 98, Pls.' Resp. at 4), an apparent combination of Illinois and Texas law (*id.* at 4-5), federal common law (*id.* at 5-6), and Texas law (*id.* at 7-8) – each alternatively and independently, without taking a position as to the applicable law.

First, it is clear that federal law does not govern the question of successor liability in this diversity case.  As Defendant correctly points out, federal courts sitting in diversity apply state law to questions of successor liability, except in cases implicating important federal policies, most often in the labor and employment setting.  *See Feinberg v. RM Acquisition, LLC*, 629 F.3d 671, 674 (7th Cir. 2011) (observing that the more permissive federal common law test for successor liability is "for the sake of beneficiaries of federal statutes relating mainly to labor, including pensioners"); *Upholsterers' Int'l Union Pen. Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323 (7th Cir. 1990) (multi-employer pension obligations under ERISA).  Here, Plaintiffs make no attempt to explain *why* federal law would govern the issue of successor liability in this case, and the Court finds no basis to apply federal law under the circumstances. *Cf. Glass v. Crimmins Transfer Co.*, 299 F. Supp. 2d 878, 889 (C.D. Ill. 2004) (holding that the federal law preempts the state law of successor liability because the plaintiff's claims, like

ERISA claims, arise under a federal statute).

Second, as between Illinois and Texas law, Illinois law applies. Plaintiffs do not argue that Texas law actually applies, but instead treat Texas as one of three jurisdictions that may – but not necessarily does – provide the rule of decision. Plaintiffs commenced this action in Illinois state court and have not raised the issue of Texas law until now. Even in belatedly doing so, Plaintiffs completely ignore Illinois' choice of law rules. *See Auto-Owners Ins. Co. v. Websolv Comp., Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) (looking to Illinois choice of law principles in the first instance to conclude that Iowa law governed). Plaintiffs contend that Texas law may apply by virtue of a choice of law provision in the Asset Purchase Agreement,[3] but Plaintiffs do not discuss the provision or make any argument as to what issue(s) that provision may govern. In any event, "third parties cannot take advantage of the choice of law provisions in contracts they did not sign." *Maremont Corp. v. Cheshire*, 288 Ill. App. 3d 721, 726, 224 Ill. Dec. 233, 681 N.E.2d 548 (Ill. App. Ct. 1997). Moreover, Plaintiffs have not shown any conflict between the laws of Texas and Illinois.[4] *See Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751 & n.4 (7th Cir. 2012) (applying Illinois law where the outcome under either choice of law would be the same).

---

[3]That provision states as follows: "This Agreement shall be construed, interpreted and the rights of the parties determined in accordance with the laws of the State of Texas, except with respect to matters of law concerning the internal corporate affairs of any corporate entity which is a party or the subject of this Agreement, and as to those masters the law of the jurisdiction under which the responsive entity derives its powers shall govern." (Purchase Agreement § 9.3.)

[4]To be sure, Plaintiffs argue that Texas law, unlike Illinois law, adheres to the so-called "product line" exception. But that argument rests on a misreading of Texas case law. *See, e.g.*, *Ford, Bacon & Davis, LLC v. Travelers Ins. Co.*, 635 F.3d 734, 735 (5th Cir. 2011) ("Texas law explicitly rejects the product-line successor liability rule"). Plaintiffs do not identify any other claimed conflict of law.

## B.    Analysis

Defendant moves for summary judgment on Plaintiff's claims of successor liability, arguing that Defendant as a matter of law "has no liability as the successor corporation to Fairchild." (R. 75, Def.'s Mem. at 7-13.) The Court agrees.

Under well-settled Illinois law, "a corporation which purchases the assets of another corporation is not generally liable for the debts and liabilities of the transferor in the absence of an agreement providing otherwise." *Gonzalez v. Rock Wool Eng'g and Equip. Co., Inc*., 117 Ill. App. 435, 72 Ill. Dec. 917, 453 N.E.2d 792 (Ill. App. Ct. 1983) (citing *Barron v. Kane and Roach, Inc.,* 79 Ill. App. 3d 44, 34 Ill. Dec. 569 398 N.E.2d 244 (Ill. App. Ct. 1979)); *see also Moriarty v. Svec*, 164 F.3d 323, 327 & n. 4 (7th Cir. 1998) (applying Illinois law); *Workforce Solutions v. Urban Servs. of Am, Inc*., 2012 WL 3711719, at *14, 2012 IL App. 111410, --- N.E.2d ---- (Ill. App. Ct. Aug. 28, 2012); *Flanders v. Calif. Coastal Cmty., Inc.*, 356 Ill. App. 3d 1113, 1118-19, 293 Ill. Dec. 483, 828 N.E.2d 793 (Ill. App. Ct. 2005). The Illinois Supreme Court has explained the "[t]he traditional rule of successor corporate nonliability 'developed as a response to the need to protect bona fide purchasers from unassumed liability and was designed to maximize the fluidity of corporate assets.'" *Diguilio v. Goss Int'l Corp.*, 389 Ill. App. 3d 1052, 1059-60, 329 Ill. Dec. 657, 906 N.E.3d 1268 (Ill. App. Ct. 2009) (quoting *Vernon v. Schuster*, 179 Ill.2d 338, Ill. Dec. 195, 688 N.E.2d 1172 (1997)).

"Despite the traditional rule of successor corporate nonliability, a successor corporation can face liability, if one of the following four exceptions applies: (1) if there is an express or implied agreement of assumption; (2) if the transaction between the purchaser and the seller corporation is a consolidation or merger; (3) if the purchaser is a continuation of the seller; or (4)

if the transaction is an attempt to escape liability for the seller's obligations." *Diguilio*, 389 Ill. App. 3d at 1060-61 (collecting cases and observing that these exceptions seek to temper the "potential harsh impact of the traditional rule"); *see also Moriarty*, 164 F.3d at 327 n.4 (internal citation omitted); *Workforce Solutions*, 2012 WL 3711719 at *14.

Here, the undisputed evidence shows that the Bankruptcy Court approved the transfer of Fairchild's assets "free and clear of any and all liens, claims and encumbrances" (*see* R. 78, 79, 80); *accord* 11 U.S.C. § 363(f), and to a purchaser that was not an insider, affiliate or owner of Fairchild. *Cf. Park v. Townson & Alexander, Inc.*, 287 Ill. App. 3d 772, 773, 223 Ill. Dec. 163, 679 N.E.2d 107 (Ill. App. Ct. 1997) ("Continuity of stock ownership has been held to be a critical factor in determining successor liability under the mere continuation approach."). The Asset Purchase Agreement expressly excluded all Fairchild liabilities (including products claims).

Plaintiffs nonetheless argue that Defendant has successor liability because it "impliedly assumed Fairchild's continuing duty to warn." (R. 98, Pls.' Resp. at 4-5 (section heading: "Defendant M7 Impliedly Assumed Fairchild's Liabilities").) But as Defendant correctly points out, the "question is not whether M7 'impliedly' assumed a 'duty to warn,' but rather whether M7 had an implied agreement with Fairchild whereby M7 agreed to assume Fairchild's liabilities." (R. 107, Def.'s Reply at 5.) Plaintiffs offer no law or facts to meet that standard. *See Pielet v. Pielet*, 407 Ill. App. 474, 486 & n. 6, 942 N.E.2d 606 (Ill. App. Ct. 2010) (observing that the exception for "implied agreement of assumption" is a creature of contract), nor do Plaintiffs argue that any other exception applies. *See Diguilio,* 389 Ill. App. at 1062 (finding as a matter of law that the "implied agreement of assumption" exception did not apply,

where the bankruptcy court had approved the sale of certain assets free and clear of all claims);

*Consol. Servs. & Constr., Inc. v. S.R. McGuire Builder and Gen. Contractor, Inc.,* 367 Ill. App. 3d 324, 305 Ill. Dec. 123, 854 N.E.2d 715 (Ill. App. Ct. 2006) ("The overriding policy goal of a discharge in bankruptcy is to provide debtors with a fresh start"). *Cf. Travis v. Harris Corp.*, 565 F.2d 443 (7th Cir. 1977) (rejecting claim of implied assumption of liabilities under Indiana and/or Ohio law).

Under these circumstances, and based on the undisputed record, the Court grants Defendant's motion for summary judgement on Counts VII, VIII, X & XI, which seek to impose successor liability on Defendant for the actions of its corporate predecessor. *See Caballero v. Uniloy Milacron, Inc.*, No. 02 C 3086, 2003 WL 22053629, at *8 (N.D. Ill. Sept. 3, 2003) (granting summary judgment to successor corporation).

### C.      Conclusion

The Court grants Defendant's motion for summary judgment on Counts VII, VIII, X and XI.

## II.      Direct Liability – Counts IX and XII

In Counts IX and XII, Plaintiffs allege that Defendant owed – and breached – an independent "duty both [1] to advise of defects in the accident aircraft and [2] to advise owners and operators of the accident aircraft to fit that aircraft with an Enhanced Ground Proximity Warning System." (R. 98, Pls.' Resp. at 8.)  Plaintiffs do not elucidate the nature of the any alleged defects other than the absence of an Enhanced Ground Proximity Warning System, and therefore the Court will focus, as the parties do, on the warning system.

In the Second Amended Complaint, Plaintiffs allege that M7 "negligently failed to advise [Transair] to fit the subject aircraft with an Enhanced Ground Proximity Warning System or other terrain collision warning system which would provide timely aural and visual warnings and alerts as to approaching terrain." (R. 76-1, Am. Compl. at 14.) Defendant moves for summary judgment on the basis that it "had no independent duty to warn" and therefore the claims fail as a matter of law. (R. 75, Def.'s Mem. at 13.) Plaintiffs respond that (1) Defendant had a duty to warn by operation of law; and (2) alternatively, Defendant voluntarily assumed a duty to warn. (R. 98, Pls.' Resp. at 8, 12.)

### A. Legal Standard

To prevail on their claims of direct (i.e. non-successor) liability, Plaintiffs must establish that Defendant owed an independent duty to warn of the alleged defects in the Subject Plane. *See Turner v. N. Ill. Gas Co.*, 401 Ill. App. 3d 698, 704-05, 341 Ill. Dec. 208, 930 N.E.2d 418 (Ill. App. Ct. 2010) (stating that "[t]he existence of a duty is a question of law for the court to decide" and that the plaintiff must "provide facts 'from which the court could infer the existence of a duty'" to defeat summary judgment on that issue); *accord Caballero*, 2003 WL 22053629, at *8 (stating that the existence of a duty "is a question of law to be determined by the court") (citing *Adams v. N. Ill. Gas Co.*, 333 Ill. App. 3d 215, 219, 266 Ill. Dec. 411, 774 N.E.2d (2002)). Illinois law defines a duty as "a legal obligation to conform one's conduct to a certain standard for the benefit or protection of another." *Kurtz v. Wright Garage Corp.*, 262 Ill. App. 3d 1103, 1107, 200 Ill. Dec. 558, 635 N.E.2d 897 (Ill. App. Ct. 1994). Here, Plaintiffs contend that Defendant owed a duty by operation of law and also by voluntary assumption.

## B.     Duty to Warn by Operation of Law

"Illinois courts have recognized a limited cause of action against the purchaser of a product line for failing to warn of defects in its predecessor's products."[5]  *Caballero*, 2003 WL 22053629, at *8 (citing *Kaleta v. Whittaker Corp.*, 221 Ill. App. 3d 705, 715, 164 Ill. Dec. 651, 583 N.E.2d 567 (1991) and *Gonzalez v. Rock Wool Eng'g and Equip. Co., Inc.*, 117 Ill. App. 3d 435, 438, 72 Ill. Dec. 792, 453 N.E.2d 792 (Ill. App. Ct. 1983)).  "[T]he critical element required for the imposition of this duty is a continuing relationship between the successor and the predecessor's customers benefitting the successor."  *Caballero*, 2003 WL 22053629, at *8 (citing *Gonzalez*, 117 Ill. App. 3d at 438)).  "[T]o determine the presence of a nexus or relationship effective to create a duty to warn, the following factors may be considered":

> (1) succession to a predecessor's service contracts; (2) coverage of the particular machine under a service contract; (3) service of that machine by the purchaser corporation; and (4) a purchaser corporation's knowledge of defects and of the location or owner of that machine.

*Id.* (citing *Travis*, 565 F.2d at 449); *see also City of Aurora v. Am. LaFrance Corp.*, No. 81 C 6638, 1985 WL 3141, at *6-7 (N.D. Ill. Oct. 10, 1985)*; Taylor v. Harris Corp.*, No. 84 C 4576, 1985 WL 951, at *3-4 (N.D. Ill. Apr. 23, 1985); *Kaleta,* 221 Ill. App. 3d at 715.

In *Gonzalez*, the defendant was the corporate successor to a machine manufacturer.  *See* 117 Ill. App. 3d at 436.  The defendant purchased the assets of the manufacturer and continued to manufacture similar machines.  *Id.*  After the asset purchase, the plaintiff was injured by a defective machine that the predecessor corporation had manufactured.  *Id.* at 436-37.  The plaintiff sued the successor corporation for breach of the duty to warn, but the court held that the

---

[5]Use of the phrase "product line" should not to confused with the so-called "product line" exception to successor liability that Illinois courts have declined to apply.

successor had no such duty. The court reasoned that there was an insufficient "continuing relationship" between the successor and the plaintiff's employer that operated the machine at the time of the accident. *Id.* at 437-38. Specifically, the court reasoned that the defendant did not assume its predecessor's service contracts, and although the successor offered to maintain and service the machine, "there is no indication" that the plaintiff's employer – the operator of the machine at issue – accepted that offer. *Id.*

Similarly in *Kaleta*, the court declined to impose a duty to warn upon a successor corporation. The plaintiff, a baggage loader for American Airlines, was injured by a "mobile beltloader"[6] while inside the baggage hold of a jetliner. 221 Ill. App. 3d at 707. At the time of the accident, the product manufacturer had dissolved, but a successor corporation that purchased the assets of the manufacturer remained. The plaintiff brought suit against the successor for failure to warn, but the court held that there was "no evidence of a continuing relationship between [the successor] and American Airlines with respect to servicing" of the beltloaders. The court reasoned that the successor did not assume its predecessor's service contracts with American Airlines. *Id.* at 713. "In fact," the court explained, "the subject beltloader was sold and shipped by [the predecessor] and [there is] no evidence that the particular machine was ever serviced by [the successor]." *Id.* ("Like *Gonzalez*, in the absence of evidence indicating a continuing relationship between [the successor] and American Airlines, we believe that there is no basis for the imposition of liability upon [the successor] for breach of a duty to warn.").)

_____

[6]"A mobile beltloader is a piece of motorized ground equipment that has a conveyor belt which can be raised up to the level of the jet aircraft baggage hold." *Kaleta*, 221 Ill. App. 3d at 708.

Here, Plaintiffs argue that Defendant owed an independent "duty to warn of defects in the subject model aircraft." (R. 98, Pls.' Resp. at 12.) Plaintiffs reason that Defendant "succeeded to the business of its predecessor, Fairchild, in manufacturing and selling parts, . . . providing technical support to Fairchild's former customers, and maintaining, repairing, and overhauling Fairchild aircraft." (*Id.* at 10-11 (citing R. 96, Pls.' Stmnt. of Add'l Facts ¶¶ 3, 7-8, 21-25, 27-28, 31-32).) Plaintiffs additionally reason that Defendant serviced the "subject model aircraft" (although not the Subject Aircraft itself); is familiar with the technical design of the subject model; and knew of "the identity and location of Transair, the owner and operator of the Subject Aircraft at the time of the crash." (*Id.* at 12 (citing R. 96, Pls.' Stmnt. of Add'l Facts ¶¶ 12-13, 19-20).)

Here, as in *Gonzalez* and *Kaleta*, viewing the evidence in the light most favorable to Plaintiffs, there is an insufficient nexus or relationship between Defendant and the operator of the Subject Aircraft to impose an independent duty to warn upon Defendant. Plaintiffs focus their argument on the relationship between Defendant and the product line generally, but that is not the legal standard: Illinois law focuses on the relationship between the successor (here, Defendant) and the operator of the allegedly defective unit (here, Transair). *See, e.g.*, *Kaleta*, 221 Ill. App. 3d at 713 (finding insufficient relationship between successor and American Airlines, the operator of the defective machine); *Gonzalez*, 117 Ill. App. 3d at 438 (finding insufficient relationship between successor and Forty-Eight Insulations, the operator of the defective machine); *accord Taylor*, 1985 WL 951, at *3-4 ("There are no allegations that [the successor] assumed [the predecessor's] service contracts on Machine #309, served that machine while it was owned by plaintiff's employer, or had any knowledge or contract with plaintiff's

employer.").  Indeed, unlike some jurisdictions, Illinois does not adhere to the so-called "product-line exception" to successor liability.  *Compare Ray v. Alad Corp.*, 19 Cal. 3d 560, 36 Cal. Rptr. 574, 582 P.2d 3 (1977) ("a party which acquires a manufacturing business and continues the output of its line of products under the circumstances here presented assumes strict tort liability for defects in units of the same product line previously manufactured and distributed by the entity from which the business was acquired") *with Gonzalez*, 117 Ill. App. 3d at 440 ("The corporate successor to the manufacturer of an allegedly defective product, who takes succession after the product has left the manufacturer's control, is clearly outside of the original producing and marketing chain. Such a corporate successor cannot fairly be said to have participated in placing the product into the stream of commerce.") (internal citation omitted).

Here, it is undisputed that "M7 did not assume any of Fairchild's serve contracts relating to the Subject Aircraft, and [that] M7 never serviced, maintained, or repaired the Subject Aircraft."  (R. 76 & 96, Undisputed Facts ¶ 31.)  M7 never had "any service contracts covering the Subject Aircraft with any owner or operator of the Subject Aircraft, including Transair."  (*Id.* ¶ 32.)  Defendant, unlike Fairchild, does not manufacture aircraft, and although it may provide technical support generally, there is no evidence that it worked on or had any contact with the Subject Aircraft.  *See Caballero*, 2003 WL 22053629, at *8 (finding no duty to warn, where successor did not assume service contracts and did not serve the machine at issue, even though the successor sold replacement parts and provided periodic safety bulletins to the operator).

Additionally, although Plaintiffs argue that Defendant "knew of the identity and location of Transair," the record evidence upon which Plaintiffs rely do not support that assertion.  (R. 98, Pls.' Resp. at 12 (citing R. 96, Pls.' Add'l Stmnt. of Facts ¶ 20).)  The proffered evidence,

viewed in the light most favorable to Plaintiffs, shows merely that Transair subscribes (or did at some point; the evidence is undated) to a revision service and – at some point – purchased some spare parts.  The record does not contain any additional information, including whether the revision service and/or parts related to the Subject Aircraft or model.  *Cf. Caballero*, 2003 WL 22053629, at *8 (finding no duty to warn even though the successor "did have contact" with the operator, including selling spare parts).

For all of these reasons, Plaintiffs have failed to establish that Defendant owed a duty to warn under Illinois law.

### C.       Voluntary Assumption of a Duty to Warn

Plaintiffs alternatively seek to impose a duty to warn under a theory of voluntarily undertaking.  (R. 98, Pls.' Resp. at 13.)  Under Illinois law, even in the absence of an affirmative duty, "a duty to act reasonably may be imposed when a defendant negligently performs a voluntary undertaking."  *Ordman v. Dacon Mgmt. Corp.*, 261 Ill. App. 3d 275, 279, 199 Ill. Dec. 316, 633 N.E.2d 1307 (1994).  Section 323 of the Restatement (Second) of Torts sets forth the general rule:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

*Frye v. Medicare-Glaser Corp.*, 153 Ill.2d 26, 31, 178 Ill. Dec. 763, 605 N.E.2d 557 (1992) (quoting Rest. (Sec.) Torts § 323); *see also Brown v. Walker Nursing Home, Inc.*, 307 Ill. App. 3d 721, 726, 240 Ill. Dec. 892, 718 N.E.2d 373 (Ill. App. Ct. 1999) ("Illinois case law has

consistently held that a court may take public policy considerations into account when determining if a duty has been voluntarily undertaken."). "Under a voluntary undertaking theory of liability, the duty of care to be imposed upon a defendant is limited to the extent of the undertaking." *Bell v. Hutsell*, 2011 IL 110724, 353 Ill. Dec. 288, 293-95, 955 N.E.2d 1099 (2011) (stating that Illinois courts look to the Restatement (Second) of Torts to define the theory).

Here, Defendant argues that Plaintiffs' voluntarily undertaking theory fails because even if it undertook a duty (which it disputes) by, among other things, "provid[ing] warnings, advice, and opinions and information to owners and operators" (R. 98, Pls.' Resp. at 13), Plaintiffs have failed to proffer sufficient evidence of reliance. The Court agrees. *See, e.g.*, *Frye*, 153 Ill.2d at 34-35 (affirming grant of summary judgment where "there is no evidence that" the plaintiff's injury "was due to his reliance" on the defendant's conduct). Plaintiffs seek to hold Defendant liable for its failure to warn at all, rather than for failure to adequately warn. For this reason – referred to as liability for nonfeasance – Illinois law requires proof of reliance; that is, proof that the operator (here, Transair) relied on the defendant's voluntary undertaking of a duty to warn. *See, e.g.*, *Chisolm v. Stephens*, 47 Ill. App. 3d 999, 7 Ill. Dec. 795, 365 N.E.2d 80, 86 (Ill. App. Ct. 1977). Plaintiffs offer no such proof, nor do they even argue in conclusory fashion that Transair relied. *See Bell*, 2011 IL 110727 ("Decisions of our appellate court have also underscored the necessity of reliance if a defendant is to be held responsible for nonfeasance: 'Under Illinois law, a plaintiff's reliance on the defendant's promise is an independent, essential element in cases of nonfeasance.'") (quoting *Buerkett v. Ill. Power Co.*, 384 Ill. App. 3d 418, 428, 323 Ill. Dec. 430, 893 N.E.2d 702 (2008)).

**D.     Conclusion**

The Court grants Defendant's motion for summary judgment on Counts IX and XII.

**CONCLUSION**

For all of the reasons discussed above, the Court grants Defendant M7's motion for summary judgment on Counts VII, VIII, IX, X, XI, and XII of the Second Amended Complaint.

**Date:   October 23, 2012**

**ENTERED**

**AMY J. ST. EVE**
**United States District Court Judge**